FITE *v.* FITE.

5-2373

345 S. W. 2d 362

Opinion delivered April 17, 1961.

*Spitzberg, Bonner, Mitchell & Hays,* by *Steele Hays,* for appellant.

*House, Holmes, Butler & Jewell,* and *Darrell D. Dover,* for appellee.

PAUL WARD, Associate Justice. This is a suit to recover money on the ground of unjust enrichment. Appellee, Mrs. Bateman Fite, Sr., deposited to the joint account of her son and his wife the sum of $7,500 for the down payment on real estate in Little Rock, the title to which was taken in the name of the son and his wife by the entirety. A few months later the son died and the daughter-in-law refused to repay the money, resulting in this litigation.

The issues, being submitted to a jury on the testimony of appellee together with certain exhibits and the court's instructions, were resolved in appellee's favor against appellant individually and as executrix and, this appeal follows.

Prior to July 3, 1958, appellee (a widow) resided in Memphis, Tennessee. Likewise her son (J. Bateman Fite, Jr.) and his wife (Boneta L. Fite) lived in Memphis in a home which they owned by the entirety. For some months prior to the above mentioned date, Fite, Jr., had been working in Little Rock where he had secured permanent employment and where he and his wife had decided to purchase property and make their home. Apparently Fite, Jr., had practically completed arrangements to purchase from Lily M. Carmichael certain real estate in Little Rock described as follows:

Tracts 1, 2, 3, and 4, Comstock's Addition to Little Rock: Also west half of the NW¼ of the NW¼ of Section 21, Township 1 South, Range 12 West, containing 20 acres, more or less, all in Pulaski County, Arkansas.

On the morning of July 3, 1958, Fite, Jr. called his mother (appellee) in Memphis and asked her to advance

him $7,500 to make a down payment on the above described property. In response to this request appellee promptly deposited $7,500 in a Memphis bank to the joint account of Fite, Jr., and his wife, which account was then being maintained in said bank. On the same day above mentioned, Fite, Jr., wrote a check in the amount of $7,430.87 on the Memphis joint account and delivered it to the Little Rock Abstract Company as a down payment on the purchase price of the property heretofore described. On the same day Lily M. Carmichael executed and delivered a deed to said property to "J. Bateman Fite, Jr., and Boneta L. Fite, his wife." Shortly thereafter Fite, Jr., and his wife occupied their new home in Little Rock. Approximately three months later Fite, Jr., died, whereupon the legal title in the Memphis and Little Rock property vested by law in Boneta L. Fite. A few months later appellee requested Boneta to repay the $7,500 and when she refused to do so suit was filed.

On the same day that Fite, Jr., and his wife received a deed to the Little Rock property they executed a mortgage on said property to the Pulaski Savings & Loan Association to secure the payment of $20,000, and on the same day they executed a second mortgage on the property to Lily M. Carmichael to secure the payment of $2,000. On March 10, 1959, Boneta sold a portion of the Little Rock property (described by metes and bounds) consisting of 4.41 acres for $29,000 and on June 30, 1959, she sold the Memphis residence and received in excess of the sum of $7,500 over and above the cost of sale and mortgage thereon. About the same time she sold the rest of the Little Rock property for $5,000. Boneta was appointed executrix of the estate of her husband. The only judgment questioned on appeal is the one entered against Boneta individually.

The complaint in the Circuit Court, after stating many of the facts above related, further stated that the acceptance and use of the said loan of $7,500 by Boneta Fite (hereafter referred to as appellant) constitutes a ratification of the loan from appellee; that the gross assets of Fite's estate do not equal $7,500; that appel-

lant had sold all real estate bought in Little Rock and Memphis for an amount of about $13,000 over and above all indebtedness on the property, and; that appellant "used the proceeds of said $7,500 for her own use and benefit and is legally and equitably obligated to return said sum . . ." to appellee. Later the complaint was amended to state: "That the defendant, Boneta L. Fite, knew of the acts of her husband in making said loan for their joint benefit and has ratified said loan agreement and the acts of deceased as her agent by accepting, with knowledge express or implied, the benefits of said agency and loan agreement." After appellant's demurrer to the above complaint and amended complaint had been overruled, by the trial court, she filed an answer containing a general denial.

The decisive questions for decision are whether the trial court erred in submitting the issues to the jury on the principle of unjust enrichment, and whether the facts in this case sustain an application of that principle.

We find no fault with appellant's definition of the principle of unjust enrichment as copied from Vol. 2 R. C. L., p. 778, as follows:

"Though an action at law it is equitable in its nature, and is said to resemble a bill in equity, and to lie wherever a bill in equity would lie. . . . it is not dependent, however, upon an express promise, or even upon one implied in fact, but is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it . . ."

In the same connection appellant quotes extensively from Vol. 4, Am. Jur., Assumpsit, Sec. 20, (p. 508) from which we quote as follows:

"The action for money had and received was invented by the common-law judges to secure relief from the narrower restrictions of the common-law procedure which afforded no remedy in too many cases of merit. . . . But the action should not be held to apply to a case, under the facts of which a court of equity itself, were the

plaintiff at liberty to go there, would not entertain a bill and grant the relief asked. The action is liberal in form and greatly favored by the courts. . . . It lies where there is an express promise, . . . [but] The action is not dependent, however, upon an express promise, or even upon one implied in fact, although the action is contractual in form. The action for money had and received is founded upon the principle that no one ought unjustly to enrich himself at the expense of another, and it is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it . . ."

In Vol. 58, C. J. S., Money Received, Sec. 4, (p. 913) we find many expressions in harmony with the above quotations. The following extracts are typical:

"The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. . . . The main principle by which to test the matter is whether in equity and good conscience, in view of the special facts of the case, defendant is entitled to retain the money as against plaintiff, . . ."

We find that the principle of unjust enrichment is more frequently applied in courts of Chancery, but as heretofore noted, it is also recognized in courts of law. It has been approved by this court as applied to a law court in the case of *Arkansas National Bank* v. *Martin*, 110 Ark. 578, 163 S. W. 795. This case was tried in Circuit Court of Garland County on dissimilar facts but involving the principle of unjust enrichment. In sustaining the application of said principle the court approved the following enunciation by the Supreme Court of Minnesota in the case of *Brand* v. *Williams*, 29 Minn. 238, 13 N. W. 42:

" 'An action for money had and received can be maintained whenever one man has received or obtained possession of the money of another, which he ought, in equity and good conscience, to pay over. This proposition is elementary. *There need be no privity between*

*the parties, or any promise to pay, other than that which results or is implied from one man's having another's money, which he has no right conscientiously to retain.'"* (Emphasis supplied.)

In the case of *Patton* v. *Brown-Moore Lumber Company,* 173 Ark. 128, 292 S. W. 383, this court, in discussing the same question, said: ". . . the law implies a promise only when, under the circumstances and proof, it would be the duty of the defendant to make such a promise." Appellant directs our attention to the case of *Anderson* v. *Anderson,* 155 Kansas 69, 123 P. 2d 315, where it was said: "While it is said that a defendant is liable if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine."

Appellant strongly contends that the facts in the case under consideration, when considered in connection with the principle heretofore set out, are not sufficient to justify the verdict of the jury and the judgment of the court in favor of appellee as against appellant individually. It is a fact that nowhere in the testimony of appellee (the only witness to testify) did she state that appellant promised to repay the money. She also said she did not know of her own knowledge that appellant knew of the existence of the loan. The vital question therefore appears to be whether the jury was justified in concluding, from all the evidence and from all inferences reasonably deducible therefrom, that appellant had knowledge of the source and purpose of the advancement by appellee. If she did have such knowledge then she was undoubtedly obligated to repay.

Appellee's testimony in this connection, in addition to the facts heretofore stated, is substantially as presently set forth. My daughter-in-law made trips to little Rock during May and June in 1958 looking for a residence, and she selected the Carmichael home in Comstock Addition; about 11 o'clock on July 3, 1958, my

son called me and asked me if I would loan him and Boneta $7,500 and I told him that I would; he advised me that the money was to be a down payment on the home they were buying; their house in Memphis had not been sold and they needed a down payment on the Little Rock house and he asked me if I would lend him and Boneta $7,500 until the Memphis house was sold; I made out my check to my son and his wife and it was deposited in the Memphis bank to their joint account as my son directed; I did not ask him to sign a note or mortgage since he said the money would be repaid when the Memphis house was sold and that he had no other source of repaying the money. Soon after July 3, 1958, my son and his wife moved to Little Rock permanently; about that time their home in Memphis was listed for sale and continued to be during July and August; I went over to Little Rock and stayed with my son and his wife about the first of September and assisted them in moving; I did not mention the loan to my son or Boneta at that time because I knew they did not have the money until the Memphis property was sold and I knew it had not been sold as I had a key to the house, and it was not sold at the time of my son's death on October 31, 1958. I did not discuss the loan with my daughter-in-law at the funeral because it wasn't appropriate and I knew her house in Memphis hadn't been sold; I had one letter from Boneta about a month after the funeral and she said nothing about the place, but I called her in January of 1959 because I had not heard from her and I knew she was aware of this debt; I said to her "Bonny", I would like to know what you are going to do about this debt of $7,500—of course you know about it. I would like to know what plans you are making toward paying it; at first she didn't say anything and then she said "I don't know anything about it." 1 said I told her she knew my son got the money and she said she knew he got it some place but didn't know where, and she dropped off the conversation and said "I feel sorry for you" and I haven't heard from her any more.

As we have frequently said, and as we have already intimated, a jury can draw reasonable inferences from testimony. From the uncontradicted testimony above set out we think the jury could have reasonably concluded that appellant knew where the $7,500 came from and the purpose for which it was to be used and was used. She helped her husband select the Little Rock property and (as she admits) she knew her husband got the money from some source. The check for $7,500 was made out to her (and her husband) and it was deposited to her (and her husband's) account; and it was used to buy the property she (and her husband) selected to buy. According to the uncontradicted evidence she gave a hesitant reply when she was told by appellee in January, 1959 that she knew about the loan. In addition there is the perhaps significant circumstance that, after she knew she was expected to repay the $7,500, she sold not only the Memphis property but all of the Little Rock property without saying anything to appellee and kept the proceeds. It is true there is an absence of any evidence of a direct promise by appellant to pay, but, as we have already pointed out, such promise can be implied (and we think it is here) from the facts and circumstances.

We must, as we have frequently held, view the testimony in the light most favorable to support the judgment of the trial court, and when so viewed (and in the absence of any objections to the court's instructions) we have concluded the record contains substantial evidence in this case to support the verdict of the jury and the judgment based thereon.

Affirmed.

GEORGE ROSE SMITH, J., dissents.

GEORGE ROSE SMITH, J., dissenting. This dispute was submitted to the jury under a sweeping instruction which permitted a verdict for the plaintiff if the jury should find that in equity and good conscience the money ought to be repaid by the defendant. It is not surprising that the jury returned a verdict for the plaintiff, because her unhappy predicament would appeal to anyone's sense

of fairness. It is surprising to me, however, that the judgment is being affirmed, for I can discover no legal theory to support the decision.

If Bateman Fite had borrowed money from his mother or from anyone else for general purposes and had used the funds to purchase property as a gift to his wife it is plain enough that she would have been under no personal obligation to repay the loan. It is equally plain that if Bateman had used such a general loan in the purchase of property as an estate by the entirety his widow would have succeeded to the title upon his death without being personally liable for the debt. In these examples, as in the case at bar, it would obviously be against equity and good conscience for the wife or the widow to keep the property without repaying the loan. In fact, a similar inequity occurs whenever a widow, as the surviving tenant by the entirety, acquires clear title to property despite the fact that her husband's estate proves insufficient to pay his outstanding debts.

The point is that considerations of equity and good conscience are not alone a valid basis for imposing personal liability upon this appellant. If she is responsible for her husband's debt it must be because she either expressly or impliedly agreed to repay the loan. It is conceded that there was no such express agreement. The majority succeed in finding an implied promise, but I submit that the opinion overlooks the fact that such an obligation must be implied from the appellant's *own* conduct. In the absence of an agency, which was not proved here, we cannot imply a promise on the part of the appellant from the words or the actions of her husband or her mother-in-law.

There are really only three circumstances in the record that have even a remote bearing upon the issue of implied promise. First, the appellee's check for the money lent was made payable to Bateman and his wife jointly. This fact doubtless proves that the appellee meant to make a joint loan, but it sheds no light whatever upon the appellant's state of mind. The appellant did

not even see the check, which was made out and deposited in Memphis by the appellee at a time when the appellant was admittedly in Little Rock. As far as the appellant is concerned the check might just as well have been payable to her husband alone or even to bearer.

Secondly, the check was deposited to the joint bank account of Bateman and the appellant. This fact plainly has no bearing upon the appellant's state of mind unless we are to say, as of course the majority do not say, that a wife becomes personally liable for her husband's debt whenever he borrows money and places it in the joint family bank account.

Finally, the jury might fairly have assumed, without direct proof, that the appellant knew (a) that her husband had obtained the loan in question for the expressed purpose of making a down payment upon the home already selected, (b) that the money was actually being so used, and (c) that title was being taken as an estate by the entirety. This assumption seems to be the real basis for the majority's imposition of liability, for the opinion declares: "The vital question therefore appears to be whether the jury was justified in concluding, from all the evidence and from all inferences deducible therefrom, that appellant had knowledge of the source and purpose of the advancement by appellee. If she did have such knowledge then she was undoubtedly obligated to repay."

I am unable to agree with this conclusion. A promise ought not to be implied from bare knowledge, unaccompanied either by affirmative conduct or by inaction that is equivalent in the circumstances to affirmative conduct. If the appellant impliedly promised to pay the debt she must have had a choice in the matter and she must have indicated in some way her election to assume personal responsibility for the debt. Such evidence is wholly lacking.

The most that can be said is that the appellant presumably learned from her husband that the loan in ques-

tion had been obtained from the appellee for the purpose of making the initial payment upon the Little Rock property. Should the appellant have arisen in protest and denounced the whole transaction, insisting that her name be omitted from the deed to avoid the personal responsibility that would otherwise befall her? Of course not. No wife should be expected to behave in any such manner as that. I am firmly convinced that there is no basis in this record for attributing to the appellant a tacit promise to repay her husband's debt. The judgment should be reversed and the cause dismissed.